## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHANIE BYNAKER,     : Civ. No. 1:25-CV-16
                     :
    Plaintiff,          :
                     :
       v.             :
                     : (Chief Magistrate Judge Bloom)
FRANK BISIGNANO,     :
Commissioner of Social Security,[1]     :
                     :
    Defendant.        :

## MEMORANDUM OPINION

## I. Introduction

Stephanie Bynaker filed a Title II application for a period of disability and disability insurance benefits on April 27, 2020. (Tr. 44). Bynaker's claim was initially denied by an Administrative Law Judge ("ALJ") on July 22, 2021, but the Appeals Council remanded the decision for a rehearing after Bynaker submitted additional medical evidence. (Tr. 168). After holding a new hearing, an ALJ again found that Bynaker was not disabled from her alleged onset date of disability of October 14,

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Frank Bisignano is substituted as the defendant in this suit.

2019, through March 29, 2024, the date of the ALJ's decision. (Tr. 29, 44).

Bynaker now appeals that decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.  Statement of Facts and of the Case

On April 27, 2020, Bynaker applied for disability insurance benefits, citing physical and mental impairments of costochondritis, fibromyalgia, and depression. (Tr. 113). Bynaker was 42 years old at the time of the alleged onset of disability, had a limited education, and had past employment as a hand packager. (Tr. 42).

With respect to these alleged impairments the record revealed the following: Bynaker began suffering from chest pain in the summer of

2

2019. (Tr. 1265, 1563). In September of 2019, physician's assistant Suzanne Brill at OSS health evaluated Bynaker as a new costochondritis patient. (Tr. 760). Bynaker reported rib pain on her left side when doing activities or repeated motions. (*Id.*). But her range of motion was grossly intact, she displayed minimal pain at end ranges, and her overall pain had improved since she switched to light duty at work. (Tr. 762). Brill recommended remaining on light duty for another week and prescribed Gabapentin. (Tr. 763).

The earliest records from the period of alleged disability are from an October 2019 consultation with Dr. Anne Quinn. (Tr. 616). Dr. Quinn noted Bynaker's costochondritis diagnosis and that her work was causing further pain. (*Id.*). Despite Bynaker's request to be taken off work, Dr. Quinn noted that Bynaker was "able to ambulate and perform activities of daily living [.]". (Tr. 764). Rather than restricting Bynaker from working completely, she ordered Bynaker to remain on light duty work until she could be seen for a follow-up. (Tr. 767). At a later appointment that month, Dr. Quinn noted that the limitation to light work had helped

with Bynaker's pain, and recommended she pursue costochondral joint steroid injections. (Tr. 770).

In November of 2019, Bynaker reported low level but constant symptoms of costochondritis. (Tr. 624). Lifting and similar movements aggravated those symptoms, but the injections and Gabapentin helped to manage them. (*Id.*). While Bynaker was off work at this visit, Dr. Quinn concluded Bynaker could return to work with a 25-pound limit and recommended strength and mobility exercises. (Tr. 774). Bynaker saw Dr. Quinn again in late December of 2019 and reported that her return to work made her chest pain worse, she had not been permitted to abide by the 25-pound limit, and she was now experiencing pain even on her days off. (Tr. 638). Dr. Quinn prescribed a lidocaine patch. (Tr. 641).

In January of 2020, Bynaker reported to Dr. Quinn that her chest pain was "good," although she also admitted that she would have pain when she moved around. (Tr. 642). She felt she could return to work if not made to lift heavy items. (*Id.*). She declined an injection, saying that she felt better and wanted to reserve injections for when her pain was bad. (*Id.*). At an appointment later that month, Bynaker explained to

4

Dr. Quinn that the injections gave her "great relief" and almost completely eliminated her pain. (Tr. 646). Later in January, she told Dr. Quinn that she was now working on her employer's "pretzel line," which required her to constantly abduct and adduct her arms, that she began to feel pain from that action after only an hour, and that the pain was now severe. (Tr. 650).

Also in January of 2020, Bynaker began treatment at UPMC Rheumatology for diffuse pain. (Tr. 1102). She reported pain in her hips and lower extremities as well as chronic costochondritis that had improved with injections. (*Id.*). Dr. Christine Phillips performed a physical examination and noted Bynaker had a normal range of motion, normal reflexes and coordination, no cranial nerve deficits or joint erythema, tenderness, or swelling, and displayed eight of 18 tender points. (Tr. 1104-05). Follow-up visits later in January and in February showed similar results. (Tr. 1101, 1645). Across these visits, Dr. Phillips prescribed Cymbalta, Trazodone, Tylenol arthritis, Relafen, and Gabapentin. (Tr. 1164-65).

5

Bynaker reported worsening pain in March of 2020, and she received another injection. (Tr. 699, 800). Physician assistant Brill recommended Bynaker try physical therapy and acupuncture. (Tr. 1926). Bynaker attended two physical therapy sessions but stopped because of pain. (Tr. 1288). She received another costochondral steroid injection that May. (Tr. 1313).

In October of 2020, Dr. Ahmed Kneifati performed a physical examination on Bynaker. (Tr. 1828). He observed that she walked with normal gait but was unable to stand or walk on heels and toes, she squatted only 30%, she had a normal stance, she walked without a cane, and she got on and off the exam table without issue. (Tr. 1830). Dr. Kneifati's exam showed no fibromyalgia trigger points but showed a limited range of motion in Bynaker's shoulders, hips, lumbar spine, and ankle, as well as limitations in her abilities to sit, stand, or walk and the use of her hands and feet. (Tr. 1831-43). In November of 2020, Bynaker had a follow-up at OSS health and reported that her costochondral pain had "improved," though it still averaged a five out of ten. (Tr. 1848).

Bynaker had cervical decompression surgery in April 2022. (Tr. 2268). The surgery apparently improved some of her arm related symptoms, but she continued to have a "significant amount of difficulty with axial discomfort limiting activities of daily living." (*Id.*).

In February of 2023, Bynaker consulted neurosurgeon Dr. Paul Ochalski about her lower back pain. (Tr. 3115). Bynaker presented with 5/5 strength in her extremities, but also restricted range of motion in her shoulders. (*Id*). She exhibited moderate tenderness to palpation in the paraspinal region. (*Id.*). Dr. Ochalski recommended an MRI and x-rays of her spine. (*Id.*).

At an April 2023 consultation with Dr. Scott Massey, Bynaker again showed 5/5 strength, but with giveaway weakness due to pain. (Tr. 3207). Dr. Massey also noted that her gait was slow, and that her MRI showed advanced degenerative changes at L4-5, level one facet arthropathy at L5, and a pars defect at L5-S1 with early grade one spondylolisthesis. (*Id.*). He thought that if her condition persisted, spinal fusion surgery could become necessary. (Tr. 3208).

7

Bynaker consulted with Dr. Ochalski again in September of 2023. (Tr. 3222). That examination showed no acute distress. (*Id.*). Bynaker received another MRI of her lumbar spine, which revealed an early annular tear at L4-L5. (*Id.*). Dr. Ochalski recommended a follow up MRI in six months to check for progression of the tear. (*Id.*). In November of 2023, Bynaker requested a prescription for a cane because "something happened to her back." (Tr. 3214-15).

It is against this factual backdrop that the ALJ conducted a hearing in Bynaker's case on December 8, 2023. (Tr. 76). Bynaker and a vocational expert ("VE") both testified at this hearing. Bynaker testified about her recent surgery and its effect on her upper body capabilities, her ulcer, her use of a cane, the disc issue in her back, her insurer's refusal to pay for additional surgeries, and her fatigue. (Tr. 80-88). The VE classified Bynaker's past work, then answered hypothetical questions about an individual with Bynaker's background and specific types of limitations. (Tr. 89-94).

Following this hearing, on March 29, 2024, the ALJ issued a decision denying Bynaker's application for benefits. (Tr. 29-44). In that

decision, the ALJ first concluded that Bynaker met the insured status requirement through December 31, 2025. (Tr. 31). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found Bynaker suffered from the following severe impairments: fibromyalgia, costochondritis, degenerative disc disease of the cervical and lumbar spine, osteoarthritis, bursitis of both hips, left foot plantar fasciitis, left foot/ankle neuralgia, asthma/COPD, and migraine headaches. (Tr. 32). At Step 3 the ALJ determined that Bynaker did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 34).

Between Steps 3 and 4 the ALJ concluded that Bynaker retained the residual functional capacity to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except frequently sit; frequently stand; occasionally walk; occasional climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; occasionally use foot controls bilaterally; frequently reach front/lateral, handle, finger, feel, push, pull bilaterally; occasionally overhead reach bilaterally; tolerate occasional exposure to temperature extremes, humidity, wetness, vibration, very loud noise, or concentrated dust fumes or gases; never climb ladders, ropes or scaffolds, work at unprotected heights, or contact moving mechanical parts; and can maintain concentration, persistence or pace for two hour segments sufficient to perform routine 2-3 step tasks or

instructions. As of November 27, 2023, she had the following additional limitations: lift and/or carry ten pounds occasionally and requires a cane for prolonged ambulation.

(Tr. 35).

In reaching this RFC determination, the ALJ made the following findings: the ALJ considered Bynaker's reported, subjective symptoms, and found that "claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record [.]" (Tr. 36). The ALJ then embarked on a review of the medical record evidence he found supported those findings, including, *inter alia*, examinations by various medical professionals showing normal results, improvements in Bynaker's condition from certain treatments, and normal imaging results. (Tr. 36-39).

The ALJ next considered the medical opinions on record. He was persuaded by the opinions of both state agency psychological consultants, Drs. Emanuel Schnepp and John Gavazzi. (Tr. 40). Both consultants

10

opined Bynaker had no severe mental health impairments, only mild limitations in certain areas of mental health functioning. (*Id.*). The ALJ found those opinions were supported by Bynaker's treatment records and consistent with additional evidence received at the hearing level. (*Id.*).

The ALJ was not fully persuaded by the opinions of the state agency medical consultants, Drs. Ethel Hooper and Michael Lombard. (Tr. 40). While these consultants assessed some limitations in Bynaker's functional abilities, and the ALJ found those limitations supported by the objective medical findings, he concluded that "the record as a whole, including the additional evidence received at the hearing level, indicates that [Bynaker] has additional limitations" not assessed by these consultants. (*Id.*).

The ALJ also considered Dr. Kneifati's opinion but found it unpersuasive. (Tr. 40-41). The ALJ reasoned that Dr. Kneifati's limitations were unsupported by the results of his own examination. (Tr. 41). The ALJ also found this opinion inconsistent with Bynaker's subsequent physical evaluation and noted that Dr. Kneifati's examination occurred before Bynaker received treatment for her left foot

neuroma, which resulted in significant improvement compared to her preoperative complaints. (*Id.*).

The ALJ considered the opinions of Bynaker's treating physicians (Drs. Quinn, Brill, Schultz, and Ochalski, plus Certified Physician Assistant Miller) together, and found none of them to be persuasive. (Tr. 41). The ALJ found that these opinions were rendered "either as temporary assessments for limited period of time, or, as noted are undated, with no specific support for rather generalized statements . . . [and] no corroborating objective evidence of record consistent with such subjective complaints [.]" (*Id.*)

The ALJ then found at Step 4 that Bynaker could not perform her past work but, at Step 5, found that she could perform other jobs that existed in significant numbers in the national economy, such as small parts assembler, electronics worker, shipping receiving weigher, order clerk, charge account clerk, and final assembler. (Tr. 42-43). Having reached these conclusions, the ALJ determined that Bynaker had not met the demanding showing necessary to sustain this claim for benefits and denied this claim. (Tr. 44).

This appeal followed. (Doc. 1). On appeal, Bynaker challenges the adequacy of the ALJ's decision arguing it is not supported by substantial evidence. (Doc. 12 at 6-18). As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be affirmed.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record

to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to

support the ALJ's findings.  In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).  Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see*

*also* 20 C.F.R. §§404.1505(a), 416.905(a).  This requires a claimant to show a severe physical or mental impairment that precludes [him/her] from engaging in previous work or "any other substantial gainful work which exists in the national economy."  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation.  20 C.F.R. §§404.1520(a), 416.920(a).  The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.  *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work.  *Mason*, 994 F.2d at 1064.  If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and

work experience.  20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination.  While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006).  Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.  Cases that emphasize the importance of medical opinion support for an RFC assessment typically

arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, in light of the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

### C.  <u>Standards Governing Step 3 of the Sequential Analysis</u>

At Step 3 of this sequential analysis, the ALJ is required to determine whether a claimant's impairments or combination of impairments are so severe that they are *per se* disabling, entitling the claimant to benefits. As part of this analysis, the ALJ must determine

whether a claimant's alleged impairment is equivalent to one or more listed impairments, commonly referred to as listings, that are acknowledged to be so severe as to preclude the claimant from working. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; *Burnett*, 220 F.3d 112, 119.

Thus, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered *per se* disabled and is awarded benefits. 20 C.F.R. §416.920(d); *Burnett*, 220 F.3d at 119. The claimant bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. §416.920(d); SSR 83-19 at 91). An impairment that meets or equals only some of the criteria for a listed impairment will not be sufficient. *Id.*

This Step 3 determination is a medical determination. Accordingly, the claimant must present medical evidence or a medical opinion showing that his or her impairment meets or equals a listing. However, the ALJ is not required to accept a physician's opinion if the opinion is not supported by objective medical evidence. *See Schwartz v. Halter*, 134 F.

Supp. 2d 640, 659 (E.D. Pa. 2001).  The ALJ is responsible for identifying the relevant listed impairments, given that it is it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Burnett*, 220 F.3d at 120 n.2.

### D. <u>Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms</u>

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, the ALJ must make credibility determinations.  *See Diaz*, 577 F.3d at 506.  Our review of those determinations is deferential.  *Id.*  However, it is incumbent upon the ALJ to "specifically identify and explain what evidence he found not credible and why he found it not credible."  *Zirnsak*, 777 F.3d at 612 (citations omitted).  An ALJ should give great weight to a claimant's testimony "only when it is supported by competent medical evidence." *McKean v. Colvin*, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (citations omitted).  As the Third Circuit has noted, while "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." *Chandler v. Comm'r of Soc. Sec.,* 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a)

22

("statements about your pain or other symptoms will not alone establish that you are disabled").

The Social Security Rulings and Regulations provide a framework for evaluating the severity of a claimant's reported symptoms. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. Thus, the ALJ must follow a two-step process: first, the ALJ must determine whether a medically determinable impairment could cause the symptoms alleged; and second, the ALJ must evaluate the alleged symptoms in light of the entire administrative record. SSR 16-3p.

Symptoms such as pain or fatigue will be considered to affect a claimant's ability to perform work activities only if medical signs or laboratory findings establish the presence of a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this assessment, the ALJ must determine whether the claimant's statements regarding the intensity, persistence, or limiting effects of his or her symptoms are substantiated when considered in light of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

This includes, but is not limited to, medical signs and laboratory findings; diagnoses; medical opinions provided by treating or examining sources and other medical sources; and information regarding the claimant's symptoms and how they affect his or her ability to work. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p.

The Social Security Administration recognizes that individuals may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations set forth seven factors that may be relevant to the assessment of the claimant's alleged symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: the claimant's daily activities; the "location, duration, frequency, and intensity" of the claimant's pain or symptoms; the type, dosage, and effectiveness of medications; treatment other than medications; and other factors regarding the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### E. This Case Will Be Affirmed.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek*, 139 S. Ct. at 1154.  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Bynaker first argues that the ALJ appears to have considered only if her impairments "met" one of the listings, and not if they may have "equaled" a listing.  Bynaker argues this shows that the ALJ applied the incorrect legal standard.

There is a material difference between "meeting" and "equaling" a listing and both must be considered, both in general and specifically for Bynaker's impairments of migraine headaches and fibromyalgia.  *See* 20 CFR §§ 404.1526, 416.926; SSR 19-4p, 2019 WL 4169635 at *7; SSR 12-2p, 2012 WL 3104869 at *6.  However, even if we concluded that the ALJ

erred in this regard, Bynaker fails to show she was prejudiced by the error.

Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014). The Supreme Court has explained that "the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citation modified). Third Circuit caselaw makes clear that this applies to Step three, where "the burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment [.]" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120, n.2 (3d Cir. 2000).

Bynaker does not cite any evidence or make any argument that she meets or equals a listing. She therefore fails to demonstrate that any

error here was prejudicial. *See Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (claimant must show how they might have prevailed under a more thorough Step three analysis to show harmful error) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 533 (3d Cir. 2005); *King v. Comm'r of Soc. Sec.*, No. 12-CV-6573, 2013 WL 6188386 at *10 (D. N.J. Nov. 26, 2013) ("[T]he burden is on the Plaintiff to point to evidence proving that his or her impairment matches a listing"); *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 162 (3d Cir. 2008) (finding no error where "[Claimant] provides us with no citations to any record evidence demonstrating that her impairments are of Listing-level severity."). Because Bynaker has failed to demonstrate prejudice, any error in the ALJ's process at Step three was harmless and does not require remand.

Bynaker next objects to the ALJ's findings that she can tolerate only occasional exposure to "very loud noise" and requires a cane for "prolonged ambulation." (Doc 12 at 12-14). She argues that these two phrases are "vague and ambiguous" as well as "undefined [.]" (*Id.* at 12). We disagree.

The phrase "very loud noise" is one of five used to describe different levels of noise in the Dictionary of Occupational Titles ("DOT"), and the ALJ's limitation of "occasional exposure" to "very loud noises" comports with how that document categorizes exposure to noise. *See* U.S. Department of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, D-2 (1993) (explaining that "occasional" means up to one third of the time, that "very loud noises" are the highest level of noise used in the DOT, and that each occupation listed therein includes the frequency and level of noise exposure involved). This conclusion is supported by the DOT entries for the six occupations the ALJ found suitable for Bynaker, all of which have noise levels below "very loud." *See* DOT 706.684-022, 1991 WL 679050; DOT 726.687-010, 1991 WL 679633; DOT 222.387-074, 1991 WL 672108; DOT 209.567-014, 1991 WL 671794; DOT 205.367-014, 1991 WL 671715; DOT 713.687-018, 1991 WL 679271. Accordingly, we conclude there is no error in the ALJ's use of the term "very loud noises."

While "prolonged ambulation" is not explicitly defined in the same way, we are nonetheless able to trace the ALJ's reasoning. The ALJ

28

asked a hypothetical question to the VE about the work available for a person who, *inter alia*, used a cane for "prolonged ambulation." (Tr. 91). The VE explained that limitation would exclude light work occupations, but that there were sedentary occupations that would account for the use of a cane for prolonged ambulation. (Tr. 92). The ALJ ultimately assessed the "prolonged ambulation" limitation and found the sedentary occupations the VE recommended in response to that hypothetical accounted for that limitation. (Tr. 43, 92). This finding aligns with Social Security Ruling 96-9p, which states "if a medically required hand-held assistive device is needed only for prolonged ambulation . . . the unskilled sedentary occupational base will not ordinarily be significantly eroded." SSR 96-9p, 1996 WL 374185 at *7.

It is therefore not necessary to define the precise timeframe of "prolonged ambulation," as this limitation's impact on occupational fitness is apparent from, and accounted for within, the ALJ's decision. Contrary to Bynaker's assertion that "the VE had no reliable basis on which to assess the occupational impact of these limitations [,]" we conclude that the ALJ's language is drawn directly from the DOT and

SSR 96-9p, both of which provide a reliable basis for an assessment of the occupational impact of those limitations. Further, Bynaker has not presented any evidence to show that, if this was error, it was harmful. Accordingly, this argument is unpersuasive.

Bynaker's third and final argument is that the ALJ erred by failing to consider side effects from her medications. The Commissioner argues there is no error in failing to consider side effects where the only evidence of their existence is the claimant's own testimony. *See Schmidt v. Comm'r of Soc. Sec.*, 465 F. App'x 193, 199 (3d Cir. 2012); *Grandillo v. Barnhart*, 105 F. App'x 415, 419 (3d Cir. 2004).

Bynaker's reply brief purports to identify evidence that fatigue was a side effect of her medications. (Tr. 3010, 3127, 3164). But these citations are to notes showing only that Bynaker reported "chronic fatigue" or "fatigue," and do not show that the medications caused fatigue. The only evidence of side effects is Bynaker's own testimony, which the ALJ considered and did not find credible. (Tr. 36-37). There is therefore no basis for remand on this issue.

Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.  Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 13th day of August 2024.


_s/ Daryl F. Bloom_
Daryl F. Bloom
Chief United States Magistrate Judge